BENJAMIN R. KITTREDGE, Respondent, *v.* ARTHUR E. GRANNIS and Another, Defendants, Impleaded with ROBERT CUTTING LAWRENCE, Appellant. (Appeal No. 1.)

First Department, February 5, 1926.

Brokers — stockbrokers — action to recover value of securities left with brokers and transferred by them to defendants — evidence admissible that said firm of brokers of which appellant was formerly member systematically converted customers' securities — evidence shows that appellant, when his firm made ostensible loans on plaintiff's securities, knew plaintiff's brokers were without authority to pledge or sell — appellant's firm was not holder in due course — Negotiable Instruments Law, §§ 94, 95, applied.

In an action to recover the value of securities alleged to have been converted by defendants, in which it appears that the plaintiff left the securities with his brokers and that they transferred the securities to the defendants ostensibly

to secure a loan, but without authority by the plaintiff to do so, evidence was admissible that plaintiff's brokers had for a long time systematically converted securities left with them by customers, and that the appellant, prior to the organization of the defendant firm, was a member of the firm of plaintiff's brokers and instituted the scheme for the conversion of customers' securities and kept the private books showing such conversion. Such evidence was admissible to show that the appellant acted in bad faith in receiving the negotiable securities from plaintiff's brokers.

Under the circumstances, the appellant's firm knew when it acquired plaintiff's securities that plaintiff's brokers had transferred them in breach of trust, and, therefore, under sections 94 and 95 of the Negotiable Instruments Law, the appellant's firm did not acquire any title to the securities.

APPEAL by the defendant, Robert Cutting Lawrence, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 14th day of March, 1924, upon the verdict of a jury, and also from an order entered in said clerk's office on the 11th day of March, 1924, denying defendant's motion for a new trial made upon the minutes.

*William T. Van Alstyne* [*W. T. Van Alstyne* of counsel; *Royal E. T. Riggs* with him on the brief], for the appellant.

*Satterlee & Canfield* [*R. Randolph Hicks* of counsel; *George Gordon Battle* and *George F. Canfield* with him on the brief], for the respondent.

McAVOY, J. Defendant Lawrence appeals here from a judgment for over $160,000 which was rendered upon the verdict of a jury.

There are two causes of action sued upon. The first one alleges a misappropriation of plaintiff's bonds and the proceeds thereof. The second cause of action shows the fraud by which the defendants acquired the bonds of the plaintiff and gives an outline of a system of fraud practiced by a brokerage firm known as Coster, Knapp & Co. with the knowledge and assistance of the defendant firm of Grannis & Lawrence. It is claimed that Grannis & Lawrence knowingly assisted Coster, Knapp & Co. in fraudulently using the plaintiff's bonds, and that, therefore, they are liable regardless of whether or not plaintiff instructed Coster, Knapp & Co., with whom he left his bonds, to make a sale of them.

The case has been tried before and a verdict had for the plaintiff in both trials for the full amount of the claim. The judgment on the first trial was affirmed here (204 App. Div. 870), but the Court of Appeals reversed that judgment and ordered a new trial. (236 N. Y. 375.) Under the decision of the Court of Appeals the case was retried, and the systematic course of stealing of customers' bonds, and the fact that plaintiff's bonds were utilized for the same purpose as others in the course of the thefts, were shown at this

trial.   There is no doubt in any mind which reviews the proof but that the brokers Coster, Knapp & Co. misappropriated the plaintiff's bonds and their proceeds.

The question upon which the decision of the Court of Appeals turned on the former record was whether or not the defendant Lawrence could be held liable for the proceeds, having paid value for the bonds and acquired them apparently in the course of trade, they being negotiable securities.   If they were acquired from an agent apparently authorized to sell them without notice of any defect in his title, even though they were sold in contravention of a secret understanding not to sell the same without instructions, the holder for value would not be required to account for their proceeds.   A history of the transactions of this firm of Coster, Knapp & Co. and the undoubted connections of Robert C. Lawrence, the defendant here, with that firm, both as an employee and manager for eleven years, and his continued relations with it through close relatives after the organization of the defendant firm of Grannis & Lawrence, shows that from the date of the organization in 1894 until April, 1908, when the firm failed, Coster, Knapp & Co. by means of a regular system appropriated for their own uses the money and securities of each of their customers.   That Robert C. Lawrence was aware of this was shown by his intimate connections with the processes of that firm as just mentioned.   He had been bookkeeper and office manager and kept all the confidential books, such as the private ledger, private asset and liability books, and a little red book, which disclosed the location of stolen securities. This latter book was largely in Robert C. Lawrence's own handwriting.   The rest was in the handwriting of his brother, A. Hicks Lawrence.   When Robert Lawrence withdrew in 1905 from Coster, Knapp & Co. he was succeeded by his brother Joseph as office manager who kept these records.   The other brother, A. Hicks Lawrence, was assistant cashier, and a cousin was bookkeeper and another cousin was a clerk.   It can hardly be conceived that he lost knowledge of this firm's activities after his departure.

The system by which the customers' securities were appropriated was, that when the firm received securities for deposit or for sale, or to collect the interest, or to reinvest same or for marginal account, to immediately sell the securities and credit the proceeds to a fictitious account on their books.   This account was called the " J. G. Marshall account," and " W. B. C. and C. C. joint account." It is referred to in the case throughout as the " J. G. Marshall account."   It really belonged to the brokerage house, and now-a-days would be called in a house which trades against its customers' orders, a " house -account."   This account was opened in the

handwriting of Robert C. Lawrence, the defendant, and it was kept throughout the time he was with Coster, Knapp & Co. under his direction. It showed everything that was misappropriated belonging to customers, and to the thieves it would record all their misappropriations. To one uninitiated it merely indicated an ordinary customer's trade account. The system worked like this: When a customer brought in a security, the brokers immediately sold it and put the proceeds in their own bank account and credited the same to the " J. G. Marshall account " on their books. If they were required to return a security or get the cash for it, they would make entry in the " J. G. Marshall account " and charge to it the security at the price prevailing at the time they had to account to the customer. If the customer demanded the security itself, they would buy in for the " J. G. Marshall account " and charge it to that account and return it to the customer. If they had to pay the customer the price of the security they would give him a check for the amount of the price prevailing at the market. This practice was not an occasional course of conduct, but the " J. G. Marshall account " shows that it was invariable. No security was ever returned or its proceeds accounted for to a customer until this brokerage house, and its manager, Lawrence, the defendant, had exhausted every method to avoid payment or the return of securities. The funds they had to account for came from the returns from the operation of their system. The record of this scheme of fraud was kept either by Lawrence, the defendant, himself, or by some one under him. It is idle to assume he believed it changed when plaintiff's bonds were negotiated to him.

The proof shows that Lawrence inaugurated this system of bookkeeping and kept it under his direction until he left the Coster, Knapp & Co. firm; that the office organization, which carried out this continuous scheme of fraud, was always under his supervision, consisting of his brothers and his relations, even after he left, and the brokerage firm of Grannis & Lawrence, of which he was a partner, carried on the bucketing of orders of customers of Coster, Knapp & Co. and assisted in the scheme of misappropriation of securities from August, 1905, when Lawrence left Coster, Knapp & Co., up to the time that the plaintiff Kittredge lost his securities and their proceeds through their sale to Grannis & Lawrence.

The reasoning of the Court of Appeals in *Kittredge* v. *Grannis* (236 N. Y. 375) is based apparently upon the idea that there was a sale of these bonds to a *bona fide* purchaser and that the authority to sell was lodged in Coster, Knapp & Co. by their possession of these negotiable securities.

The proof here shows that not only were the purchasers not innocent of knowledge of the scheme of fraud carried on by Coster, Knapp & Co., but that there was never any sale of these bonds to Grannis & Lawrence but there were loans by Grannis & Lawrence upon these bonds to their full value as collateral. They were apparently sold the following day by Grannis & Lawrence to another customer. Both of the bases of the Court of Appeals decision, that is, that there was a sale of these bonds and that the sale was made to a person who was without knowledge of the misappropriation of the securities for the sellers' own purposes, have been shown on this trial to be without foundation.

It was unquestionably proper to show through the books of Coster, Knapp & Co. what happened to securities other than those of the plaintiff, especially since knowledge of the general scheme of misappropriation was brought to the door of the defendant Lawrence. The books show the negotiation of the bonds in breach of their trust by Coster, Knapp & Co., and they also show the taking of these bonds in bad faith by the defendant. The fact that Lawrence knew that the firm was insolvent through his knowledge of the books and that the firm had been in the habit of stealing customers' securities was relevant upon the question as to whether or not taking a loan for the full amount of these securities for their own purposes was not another step in the scheme of stealing of which Lawrence had previous knowledge. The fact that instead of selling the securities the firm was obtaining an advance on the full value of them before they were sold, indicated of itself a misappropriation of which Lawrence would have ascribed to him imputed knowledge from the earlier fraudulent dealings. These entries were relevant and admissible as against Lawrence, together with the other evidence in the case as to his knowledge and opportunities for knowledge of them to show the jury the surrounding circumstances, so that they might infer the fact of bad faith in receiving these negotiable securities which would destroy the elements of negotiability.

On the second trial, the fact that Lawrence not only had notice of the entries which he made, but also was familiar with all the contents of the books, was proven clearly. There does not seem any argument against the finding that this brokerage house intrusted with plaintiff's property for deposit and ultimate sale committed a breach of trust by the transferring of these securities for a loan for its own account and not for the account of the owner, and disposed of the property contrary to the owner's orders and violated the agreement under which the property was intrusted to them. "The title of a person who [thus] negotiates an instrument is

defective " (Neg. Inst. Law, § 94), since he negotiated it in breach of faith or under such circumstances as amounted to a fraud, and defendant took with notice of defect.  (Neg. Inst. Law, § 95.) The finding that the defendant firm was not a holder in due course was imperatively required by the proof.

The judgment and order should be affirmed, with costs.

CLARKE, P. J., DOWLING, MERRELL and BURR, JJ., concur.

Judgment and order affirmed, with costs.